FILED
2012 Dec-14  PM 01:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| DEMILIA HAWKINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:11-cv-0371-TMP |
| | ) | |
| NOLAND HEALTH SERVICES, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM OPINION</u>**

This action is before the court on a motion for summary judgment filed on January 20, 2012, by defendant Noland Health Services ("NHS"). The motion has been supported by depositions, documents, affidavits, and briefs. Plaintiff, who is represented by counsel, was given the opportunity to respond to summary judgment, but has not done so. All parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636 (c). Having considered the pleadings and the evidence and arguments submitted by all parties, the court finds that the motion for summary judgment is due to be granted.

I.      **Summary Judgment Standard**

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying

those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met his burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting former Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. Celotex, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court "shall" grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party." Id. at 248.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249.  His guide is the same standard necessary to direct a verdict:  "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983).  However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The evidence supporting a claim must be "substantial," Marcus v. St. Paul Fire and Marine Ins. Co., 651 F.2d 379 (5th Cir., Unit B, 1981); a mere scintilla of evidence is not enough to create a genuine issue of fact.  Young v. City of Palm Bay, 358 F.3d 859, 860 (11th Cir. 2004); Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1249-1250 (11th Cir. 2004).  If the non-movant's evidence is so thoroughly discredited by the rest of the record evidence that no *reasonable* jury could accept it, the evidence fails to establish the existence of a genuine issue of fact requiring a jury determination.  See Scott v. Harris, 550 U.S. 372, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007) ("Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have reviewed the facts in the light depicted by the videotape."); Lewis v. City of West Palm Beach, Fla., 561 F.3d 1288, 1290 n. 3 (11th Cir. 2009).  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989).  Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could

3

reasonably find for the plaintiff.  Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988).  Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor.  Anderson, 477 U.S. at 255.  The non-movant need not be given the benefit of every inference but only of every reasonable inference.  Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

The failure to respond to a motion for summary judgment is not enough, in itself, to justify granting summary judgment.  Indeed, Rule 56(a) instructs that the court shall grant summary judgment only "*if the movant shows* that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (emphasis added).  Thus, a court "may neither grant nor deny summary judgment by default."  James Wm. Moore et al., Moore's Federal Practice, § 56.99[b] (3d ed. 1997).  As noted by the Advisory Committee, "summary judgment cannot be granted by default *even if there is a complete failure to respond to the motion*, much less when an attempted response fails to comply with Rule 56(c) requirements."  Fed. R. Civ. P. 56 advisory committee's note (emphasis added).  Because "the district court cannot base the entry of summary judgment on the mere fact that it is unopposed, it must consider the merits of the motion."  United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla., 363 F.3d 1099, 1101-02 (11th Cir. 2004).  Utilizing these standards, the court undertakes the analysis of whether the defendant has shown that it is entitled to judgment as a matter of law.

## II.    Summary Judgment Facts

Viewing the evidence in the light most favorable to the plaintiff, the following undisputed facts are relevant to the instant motion.[1]

In July 2007, plaintiff Demilia Hawkins, an African-American woman, was hired by NHS as a Patient Care Technician ("PCT") to perform personal care and cleaning tasks for hospital patients.  PCTs work a 12-hour shift, beginning at 7:00 a.m. or 7:00 p.m, but they are required to clock in 15 minutes prior to the beginning of their shift so that there is a transition period between shifts.  The plaintiff  initially was hired as a full-time employee, but in April 2008, she became an "as needed" or PRN employee.

Prior to becoming a PRN employee, the plaintiff's schedule was modified to accommodate a later start time on weekdays, under which she was not required to start her shift before 7:30 a.m. This adjustment was made to allow plaintiff to stay with her daughter at the bus stop until the bus picked her up in the mornings.  In November 2007, plaintiff received a written warning for excessive absences.  The record from that warning recites that the plaintiff understood the attendance policy and was aware that the failure to abide by the policy could lead to further disciplinary action, including termination.  Just two months later, in January 2008, plaintiff was warned again about excessive violations of the attendance policy.  The record documenting the warning states that the

---

[1]  A potential consequence of failing to oppose summary judgment is that the court may accept the facts before it as undisputed.  Rule 56(e)(3) authorizes the court to consider a fact as undisputed for purposes of the motion when a party fails to properly address the other party's assertion of fact.  This provision is consistent with the practice in some jurisdictions where local rules provide that uncontroverted facts, supported by the record, will be "deemed admitted." Moores, § 56.99[b] (3d ed. 1997).  In this case, the court has studied the record to take care that any facts deemed undisputed, due to plaintiff's failure to respond, are not contradicted or disputed by record materials.

plaintiff understood the attendance policy, but continued to have unplanned absences and was a no call/no show on December 24, 2007.  The warning also states that it is plaintiff's "final" written warning.

Two months after the "final" written warning, in March 2008, an African-American nurse manager recommended that plaintiff be terminated for "call-ins."  This recommendation for termination was never acted upon, and plaintiff continued to work as a PRN employee.  In November 2008, plaintiff was tardy for work on three occasions.[2]  On November 25, 2008, plaintiff met with her supervisor about her tardiness and clocking-out late.  The record from that meeting states: "This is a final written warning.  Demilia needs to be here at 07:30.  Furthermore, we are now asking Demilia to be here at 06:45 on the weekend since the request is related to school therefore impacting the Monday-Friday schedule.  We will still honor Demilia's request to be here at 07:30 during the week.  Demilia must clocked [sic] out within 5 minutes (7:20 PM) from the end of her shift unless previously discussed with a nurse manager.  Immediate and lasting improvement are necessary for Demilia to remains [sic] as employee of Long Term Hospital of Birmingham." (Doc. 17-2, Exh. 18). The plaintiff's signature and the signature of supervisor Sylvie Gandy appear on this record.  Plaintiff testified that she was happy with the way in which Gandy handled the situation documented in the conference record.  This was her second "final" written warning.

Prior to January 2009, the NHS clock-in policy allowed for a grace period of seven minutes, giving employees seven minutes after their scheduled start time to clock in before they were considered tardy.  Beginning in January 2009, the clock-in policy was changed and the grace period

---

[2]  The court notes that plaintiff's July 2008 evaluation indicates that plaintiff had a poor record of tardies and absences prior to going PRN.

was eliminated.  The new policy, eliminating the seven-minute grace period, was posted on the NHS intranet.  Plaintiff denies being advised of the change in policy, or using the computer available on the hospital floor where she worked to access policies.

In March 2009, plaintiff was written up because of an altercation with another nurse where she raised her voice at the nurse's desk.  Plaintiff does not dispute that the exchange happened, nor does she dispute that she got louder than the other nurse involved.  Plaintiff testified that she believed the write-up was one-sided, but she did not believe it was one-sided because of her race. This write-up is documented in the record as a written warning and  is dated March 20, 2009.  It also references plaintiff's failure to comply with the attendance and tardy agreement that she made with Sylvie Gandy.  Specifically, the write-up states that plaintiff continued to be tardy on weekends by consistently clocking in at 0728, 0705, and 0704.  Further, the write-up reports that "Demilia understands that this is a final written warning regarding the attendance and tardy policy previously agreed upon by Demilia and Sylvie Gandy, Interim DCS.  Any further violations of the agreement will result in termination."  This was plaintiff's third "final" written warning.

On March 21, 2009, the day after being disciplined and receiving her third "final" written warning for her verbal altercation and tardiness, plaintiff clocked in at 6:48 a.m., three minutes after her shift began.  On March 22, 2009, plaintiff initially was not scheduled to work, but accepted a call-in to work the 7:00 a.m. shift.  Plaintiff did not clock in for that shift until 9:42 a.m, but she contends that she told the defendant she would get there when she could, as she was not originally scheduled to work that day.

On or around April 1, 2009, plaintiff came to the hospital even though she was not scheduled to work that day.  While at the hospital, plaintiff was asked separately by two different supervisors

7

if she had a minute to speak with them.  Plaintiff informed them that she was in a rush and did not

have time to talk with them at that time.  Plaintiff's mother, who also works at the hospital and was

on duty, encouraged her daughter to go ahead and talk with the supervisors to see what they wanted.

Plaintiff agreed to do so, but changed her mind when she found out the supervisors needed fifteen

minutes of her time that she did not have.  Thereafter, a security guard asked plaintiff to leave and

escorted her out of the building. Plaintiff was terminated on April 3, 2009, for failure to comply with

the attendance agreement.

Plaintiff filed two EEOC charges (discrimination and retaliation) following her termination

from NHS. Only one of the charges (retaliation) appears in the record, but there is no dispute that

plaintiff filed her initial charge within 180 days of the unlawful employment practice she complains

of now.  After her termination from NHS, plaintiff also applied for a job at UAB.  Regarding her

application for work with UAB, plaintiff testified:

> I applied at UAB, I actually went in for an interview at UAB, and they
> were supposed to call me back, I just never heard anything.  I don't
> think they ever discussed with me how much I would be making.  I
> can't recall.  But I remember going in and doing my interview, and I
> went back for – I put my application in, and they called me back for
> an interview, and that's the only thing I can remember at that time –at
> this time.

(Doc. 17-2 , Pl. Depo. at p. 100).  As a part of the instant lawsuit, plaintiff contends that the

defendant gave UAB a negative reference in retaliation for filing an EEOC charge.

III.     **Summary Judgment Analysis**

**TITLE VII and SECTION 1981 RACIAL DISCRIMINATION CLAIMS**

Plaintiff's racial discrimination claim sounds of disparate treatment, contending that she was treated differently from similarly situated white employees. The central allegation to back up this claim is the contention that three white employees were, like her, late for their shifts, but were not reprimanded or terminated for being tardy. Plaintiff's amended complaint does not name the white employees who were treated more favorably than she was, but Amy Horsely, Tammy Gardner, and Patti Jones are identified in plaintiff's deposition as employees who were late and not reprimanded or terminated. In support of its motion for summary judgment, the defendant has submitted evidence from the Human Resources Director for the Hospital Division of NHS that references pertinent personnel records of the proffered comparators. As discussed directly below, the court is unconvinced that any of these individuals is sufficiently similarly situated to assist plaintiff in proving her discrimination claim.

*Tammy Gardner*

The defendant has submitted evidence that Gardner was hired to work as a Patient Care Technician ("PCT") at NHB on September 16, 2008. Gardner was never disciplined for unprofessional conduct in 2008 or 2009; nor did Gardner receive any disciplinary action for attendance issues during that time. In her deposition, plaintiff claims that Gardner clocked-in late with her. She did not report that Gardner came in late until February, 2009 – the month before plaintiff was given her second "final" written warning. Accepting as true that Gardner came in late in February 2009, this fact does not validate Gardner as a qualified comparator.

9

To be similarly situated, the Eleventh Circuit requires that "the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." Maniccia v. Brown, 171 F.3d 1364, 1368-69 (11th Cir. 1999), citing Dartmouth Review v. Dartmouth College, 889 F.2d 13,19 (1st Cir.1989) ("Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples."). Prior to the time when the plaintiff reported Gardner as being tardy (February 2009), plaintiff already had been written up for excessive absences (November 2007), excessive violations of the attendance policy (January 2008), and attendance issues (March or April 2008). Gardner, by comparison, has no similar record of misconduct or tardiness. Thus, even if it is true that plaintiff reported Gardner as tardy in February 2009, and this court accepts that she did, the record leading up to that time, which is pertinent to the discrimination inquiry here, is not substantially similar. Accordingly, the court is not persuaded that Gardner is a valid comparator.

*Patti Jones*

Patti Jones worked as a charge nurse at NHB in 2008 and 2009. Through the affidavit of Human Resources Director, Tina Shaw, the defendant has submitted evidence that Jones was never disciplined in 2008 or 2009 for unprofessional conduct, nor did she receive any disciplinary action for attendance issues during that time. In 2011, Jones was terminated for exhibiting behavior unacceptable as a Charge Nurse (smoking in restricted areas) and failing to arrive on time.

There is no evidence before the court that Jones engaged in unprofessional conduct or had excessive tardies during 2008 and 2009 (the primary time period when plaintiff was being "written-

up"), besides plaintiff's deposition testimony that someone named Patti also came in late.  Plaintiff's testimony falls short of establishing that the quantity and quality of Jones' alleged misconduct is nearly identical to her own.  See Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999) ("We require that the quantity and quality of the comparator's misconduct be nearly identical . . . .").  In the absence of evidence that Jones' record is "nearly identical" to plaintiff's, she is not a valid comparator.  Moreover, the evidence before the court establishes that when Jones did have an issue with tardies, in 2011, she too was terminated.  Jones was not treated more favorably than plaintiff.

*Amy Horsley*

In 2008 and 2009, Horsley worked as a charge nurse for NHB.  Unlike plaintiff, Horsley was not disciplined for any unprofessional conduct in 2008 or 2009.  Horsley was, however, reprimanded with regard to attendance issues.  In April, 2008, Horsley was issued a "verbal record of conference" regarding her failure to "call off in accordance with Company policy."  In April, 2009, Horsley was given a tardiness warning for incurring three tardies in a 12-month period.  Horsley also was reprimanded for job performance issues in 2008.  Whether Horsley is a valid compartor is a closer call than the other two proffered comparators because she does have a record of tardiness.  Notwithstanding, Horsely's record of misconduct is not "nearly identical" to plaintiff's – Horsley was not disciplined for unprofessional conduct and Horsley did not have two "final" warnings regarding attendance within a 12-month time period.  Nor, is there evidence that Horsley was tardy the very day after she was given her third "final" written warning.[3]   While closer, there is

---

[3]The court notes that the defendant's propensity to issue multiple "final" written warnings dilutes any consequential meaning of finality, much as the boy who cries wolf one too many times. Regardless, for purposes of this court's summary judgment analysis, it is sufficient that the record

nevertheless a real discrepancy between the quality and quantity of misconduct for which plaintiff was terminated and the quality and quantity of misconduct by Horsley.

Even if the misconduct by Horsley and the plaintiff correlated enough for a valid comparison, the court is unconvinced that there is evidence of disparate discipline. Plaintiff claims that she was disciplined more harshly than other employees because other employees were tardy, but she was the only one terminated. As already noted, Horsley is the only employee, out of those identified by plaintiff, who had any attendance issues, and Horsley *was* disciplined for her tardies. While it is true that Horsley was not terminated for the tardies, neither was plaintiff when she was first warned about her three tardies. Because plaintiff and Horsley were both given warnings when they first accrued several tardies, the court discerns no difference in discipline. The fact that plaintiff was ultimately terminated for her behavior does not prove disparate discipline – it only reveals that her attendance issues persisted and became more numerous than Horsley's.

At the time of her termination, plaintiff had been issued three "final" written warnings, all of which implicated some type of attendance issue. The plaintiff also had been written-up for unprofessional conduct. The day after plaintiff was given her third "final" written warning she clocked-in three minutes late for work. These facts distinguish plaintiff from Horsley in both quantity and quality of misconduct. Put simply, their records are not "nearly identical."

Because the plaintiff's record of misconduct exceeds in both quantity and quality the offenses committed by her proffered comparators, the court is unpersuaded that plaintiff can prove disparate treatment. Even is she could, the defendant has offered legitimate, non-discriminatory reasons that

---

amply evinces that plaintiff's attendance issues were well-documented and more numerous than any proffered comparator.

explain her termination.  The court will not reiterate those reasons here, except to note that they are

numerous, well-documented, and outlined above.  Moreover, plaintiff does not dispute that she had

a record of tardiness and that all of her write-ups were "legitimate."  (Doc. 17-2 , Pl. Depo. at 205).

Regarding the defendant's explanation for terminating the plaintiff, the court is mindful that the

employer's burden is merely one of production; it "need not persuade the court that it was actually

motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue

of fact as to whether it discriminated against the plaintiff." Combs v. Plantation Patterns, 106 F.3d

1519, 1528 (11 th Cir. 1997), citing Texas Dep't of Community Affairs v. Burdine, 229 F.3d 1012,

1024-25 (11th Cir. 2000).   Here, the court is persuaded that the defendant has carried its

"intermediate burden of production" of articulating legitimate, non-discriminatory reasons for

plaintiff's termination.  Consequently, "the factual inquiry proceeds to a new level of specificity"

and "the plaintiff has the opportunity to discredit the defendant's proffered explanations for its

decision." Combs, 106 F.3d at 1528.  As explained in Burdine:

> [The plaintiff] now must have the opportunity to demonstrate that the
> proffered reason was not the true reason for the employment decision.
> This burden now merges with the ultimate burden of persuading the
> court that she has been the victim of intentional discrimination.  [The
> plaintiff] may succeed in this either directly by persuading the court
> that a discriminatory reason more likely motivated the employer or
> indirectly by showing that the employer's proffered explanation is
> unworthy of credence.

Burdine, 450 U.S. at 256 (internal citations omitted).

       In this case, the plaintiff has not opposed the defendant's motion for summary judgment or

otherwise discredited the proffered reasons for plaintiff's termination as pretext for a discriminatory

motive.  There simply is no evidence to suggest, much less persuade the court, that tardiness and

unprofessional behavior are not the real reasons why plaintiff was terminated.  In the absence of such evidence, the plaintiff has failed to "cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'" <u>Combs</u>, 106 F.3d at 1538, citing <u>Cooper-Houston v. Southern Ry. Co.</u>, 37 F.3d 603, 605 (11th Cir. 1994).  Consequently, summary judgment is due to be granted on plaintiff's Title VII disparate treatment claim as well as her §1981 claims.[4]


**<u>RETALIATION</u>**

Plaintiff also asserts a Title VII retaliation claim, alleging that "the defendant gave unfavorable information to potential employers concerning the plaintiff's employment in retaliation of the plaintiff having filed a charge of discrimination against NHS."  In moving for summary judgment on this claim, the defendant contends that plaintiff has failed to prove a *prima facie* case of retaliation, which requires proof that (1) she engaged in protected expression; (2) she suffered an adverse employment action; and (3) a causal connection exists between the two events.  The major deficit of plaintiff's retaliation claim, according to the defendant, is the lack of proof that it gave plaintiff any employment reference, much less a  negative one.  Additionally, the defendant argues that there is a temporal proximity problem with her retaliation claim that defeats any causal

---

[4] Because "both of these statutes have the same requirements of proof and use the same analytical framework, . . . [the court] shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well." <u>Standard v. A.B.E.L. Services, Inc.</u>, 161 F.3d 1318, 1330 (11th Cir. 1998).

connection between her filing of an EEOC charge and the alleged unfavorable reference.  The court will address both arguments in turn.

At her deposition, plaintiff testified that she interviewed for a job at UAB and was told during the interview that someone from UAB would call her.  No one from UAB ever called – a sign, plaintiff infers, that she was given a negative reference.  Plaintiff never followed up, however, with anyone from UAB after her interview.[5]  On the other hand, the defendant has proffered evidence that it maintains strict policies and protocol regarding references for former employees.  Specifically, the defendant has submitted a declaration from its Human Resources Director attesting that "all references are directed to the Home Office in Hoover, Alabama" and that the "Home Office will only provide dates of employment, position held, and, with a signed release from the employee, the salary information for the employee."  (Doc. 17-1, Exh. A., Shaw Decl. at ¶¶ 38-39).  The defendant also has submitted evidence that "NHS has no record of UAB or any other prospective employers contacting it for information for Demilia Hawkins."  (Doc. 17-1, Exh. A., Shaw Decl. at ¶ 40).  The evidence refuting plaintiff's negative reference claim is compelling; by contrast, plaintiff's speculation fails to create a genuine dispute as to whether she was retaliated against.

---

[5]Although it is difficult to discern from her testimony, plaintiff appears to allege in her deposition that one of her previous attorneys told her, in connection with her retaliation claim, of an unnamed witness who would testify that she had been "black balled."  Evidentiary issues aside, the court is unpersuaded that this allegation, even when accepted as true, substantiates her retaliation claim.  Simply put, there is just not enough substance, or even scant detail, in her testimony to allow the court to draw any justifiable inferences in relation to a retaliation claim.  See Ferron v. West, 10 F. Supp. 2d 1363, (S.D. Ga. 1998) ("Ferron's vague suspicion that his prior discrimination complaint had somehow "followed him" and placed him on a "black list" does not constitute the competent evidence he needs to avoid summary judgment on this claim.").  Nor, has there been any attempt to develop this argument as evidenced by the lack of any opposition to summary judgment.

While filing an EEOC charge is obviously a protected expression, there simply is no evidence that the plaintiff suffered an adverse employment action to prove the second element of her retaliation claim.[6] The defendant contends, and the court agrees, that this deficiency is enough to warrant summary judgment. See, e.g., Hilt-Dyson v. City Of Chicago, 282 F.3d 456, 465 (7th Cir. 2002) ("Absent direct evidence of retaliation, failure to satisfy any element of the prima facie case proves fatal to the employee's retaliation claim.").

The defendant also argues, however, that summary judgment is due because plaintiff cannot establish a causal connection between any alleged negative reference and her filing an EEOC charge. The six-month time lapse between the plaintiff filing an EEOC charge and the allegedly adverse action of an unfavorable reference is, the defendant argues, too long a period of time from which to infer the requisite causal connection.

The court agrees, in theory, that a six-month gap between filing an EEOC charge and a subsequent negative reference poses a temporal proximity problem that is a significant hurdle. Because plaintiff's retaliation claim fails on other grounds, however, it is unnecessary to address this contention beyond noting the principal cases on the subject that support the defendant's position. Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007) ("A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough."), citing Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001), Richmond v. ONEOK, 120 F.3d 205, 209 (10th Cir.1997) (3 month period

---

[6]While termination of the employment relationship can be, and often is, construed as an adverse employment action, the court notes that in this case the plaintiff's retaliation claim is based on the alleged adverse employment action of giving "unfavorable information to potential employers." Consequently, there is no discussion here of the plaintiff's termination in connection with her retaliation claim.

insufficient), and <u>Hughes v. Derwinski</u>, 967 F.2d 1168, 1174-75 (7th Cir.1992) (4 month period insufficient)). The lack of evidence to substantiate that the defendant gave any reference regarding the plaintiff, much less a negative one, unhinges plaintiff's retaliation theory; and, this is true even if the six-month gap did not exist.  Accordingly, the court finds that the defendant is entitled to summary judgment on plaintiff's retaliation claim.


**CONCLUSION**

For all of the reasons set forth above, the motion for summary judgment filed by defendant Noland Health Services is due to be and hereby is GRANTED.  A separate order will be entered granting the defendant's motion for summary judgment contemporaneously herewith.


DONE on the 13th day of December, 2012.


T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE